THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CARNELL BROWN, Defendant-Appellant.

(No. 54041;

First District—September 10, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Saul H. Brauner and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle, and Roger S. Matelski, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE ENGLISH delivered the opinion of the court:

*OFFENSES CHARGED*

Attempt (to commit murder). Ill. Rev. Stat. 1967, ch. 38, pars. 8—4 (a), 9—1(a). Armed robbery. Ill. Rev. Stat. 1967, ch. 38, par. 18—2(a). Aggravated battery. Ill. Rev. Stat. 1967, ch. 38, par. 12—4 (b) (1). Two counts of armed violence. Ill. Rev. Stat. 1967, ch. 38, par. 33A—2.

*JUDGMENT*

After a trial by jury, defendant was found not guilty of attempt (murder) and armed robbery. He was found guilty of aggravated battery and two counts of armed violence and was given two concurrent sentences of two to five years, one for aggravated battery and one for armed violence.

*CONTENTIONS RAISED ON APPEAL*

1. The evidence was not sufficient to establish defendant's guilt beyond a reasonable doubt.

2. The court imposed an unlawful sentence.

*EVIDENCE (RELEVANT TO THE JUDGMENTS APPEALED FROM)*

*Scott Chambers,* a police officer, for the State:

On January 16, 1968, he was working with his partner, Lawrence Bork. At approximately 7:30 p.m., they received a radio message that there had been a robbery at 1306 S. Washtenaw, together with a description of the two robbers. The officers were then near the scene in the 1300 block of S. Talman in an unmarked police car, in civilian clothes. Two blocks from the place of the robbery, they noticed a youth wearing a brown coat coming west from the south alley of Talman who fitted the description of one of the wanted men. He stopped the squad car and identified himself as a police officer by showing his badge when he was eight to ten feet from the youth. He did not produce a weapon at this time. There was a blue fluorescent bulb over the mouth end of the alley, and he saw the suspect's face, whom he identified as defendant.

Defendant turned and ran east through the alley. He and his partner chased about 15 to 20 feet behind the boy. The alley is "T" shaped, and as defendant reached the middle of the alley between Rockwell and Talman, he ran north through another alley, and turned into a gangway at 1332 Rockwell, running inside a link fence, where he slipped on the ice and fell. Officer Bork reached over the fence and grabbed defendant by the collar, but he broke away and ran into a basement.

The officers followed into the basement. The witness was not running when he went into the basement door, and remembers that, while going through the door, he did not hit his head on a pipe or anything else. He checked the back utility room while his partner remained in the front of the basement. When he walked to the back of the room, he heard heavy breathing. He again announced his office and went in the back room with his gun in his right hand. Defendant stepped partially into the light with something in his hand. He then saw the blade of a knife. Although there was no light in the room where defendant was hiding, there was a light three or four feet behind the witness. Defendant stepped forward and struck him across the head with a knife. After being cut, he could not see out of his left eye. His partner came to him and he pushed him away, stepping into the room, where he was again struck, this time with a board or piece of pipe which bounced off his shoulder and hit him on the left side of his face near the eye.

He fired three times and struck defendant, who was six feet away. Other patrolmen and his partner took the witness to Mt. Sinai Hospital where a wound in his forehead was closed with ten stitches. He had a fractured skull and hematoma in the left eye. He was positive of his identification of defendant as his attacker. Neither of the two youths brought to him at the hospital was the one who had attacked him.

*Lawrence Bork*, a police officer, for the State:

He is a policeman and was patrolling in an unmarked car with Chambers on January 16, 1968. At about 7:45 or 8:00 p.m., he saw defendant coming out of an alley. His description of the chase corroborated the testimony of Chambers. He also identified defendant, and said he had never lost sight of him until he went into the basement. When he heard Chambers say, "Come on out, police officer," he ran back there and saw Chambers bleeding from the head. He started into the dark room but Chambers pushed him back, going in himself. He then heard three shots, and Chambers emerged with his head badly cut, with blood running down over his eye. Another patrolman who had heard the shots came in and the witness took Chambers to the hospital. Before leaving, he picked up a four-inch blade switch blade knife in the doorway of the back basement room.

*Arthur Minton*, a police officer, for the State:

On the night in question, he went to a vacant lot next to 1332 S. Rockwell where he saw Officers Bork and Chambers. Chambers was bleeding from the forehead, so he told Bork to take him to the hospital. He then went into the basement where he saw two other officers. They found defendant underneath a washbasin in a laundry room. He did not remember if there was a light in that room; he had a flashlight in his hand. Defendant did not fight or curse, but told them to be careful, that he was shot. He called the wagon and took defendant to the hospital.

He made a search of the premises, but found none of the articles alleged to have been taken in the robbery. He did not find a two-by-four with blood on it.

*William Thompson*, a police detective, for the State:

On the night in question, about 8:15, he went to 1332 S. Rockwell where he saw other officers. He saw defendant in the rear of the basement in the middle of the floor. He had been shot in the right leg, arm, and groin. He arrested, and then released, a suspect named Otis Brown.

*Moses Zepeda*, a police officer, for the defense:

He made out the case report at Mt. Sinai Hospital concerning the attack on Officer Chambers, the offender's name being Carnell Brown.

The report shows that another suspect, John Brown, was brought to Mt. Sinai Hospital and was identified by Officer Chambers as one of the offenders. He got the information in the report, including the name of John Brown, from Officer Bork.

*John Brown,* for the defense:
On the night in question, he was arrested and taken to Mt. Sinai Hospital where a policeman who had his head bandaged and who had a plaster on his eye, identified him as having cut him and run by him.

He lives with his brother, Otis Brown, and defendant who is his cousin.

*Otis Brown,* for the defense:
He is 15 years old. He was arrested and taken to Mt. Sinai Hospital, and his brother, John Brown, was brought there a few minutes later. The police asked the injured policeman if he had seen the witness before, and he said he had not. He said, however, that he had seen John Brown, who had hit him in the head and chased him out of the basement.

*Leo Katz,* for the defense:
He is a supervisor for Acme Spinning Company and defendant was working for him there at the date of his arrest. He knows defendant's reputation in the community for truth and veracity to be good.

*Leo Ranachowski,* for the defense:
He is an investigator for the Public Defender of Cook County and conducted an investigation of the premises at 1332 S. Rockwell. He exhibited a diagram of the basement at that address which showed three rooms in the rear for storage, utility, and cleaning facilities. The doorway to the entrance of the basement is 5 feet 2 inches high. There is a metal pipe 5 feet 4 inches above the first stair down, 25 inches inside the doorway. It is 5 feet 11 inches from the floor. Anyone taller than five feet would have to duck to get into the basement, and the pipe cannot be seen when one walks in the door. The basement is very dark and the lighting is not good. He was in the basement a number of times between May 29 and July 29, 1968, and had to use a flashlight every time. There were fixtures for lights but no light bulbs when he was there, except that one room in the front of the basement may have had a light. There is a light fixture in a central room six feet from the rear room in which he found bullet holes. On several of his visits to the basement there was a bulb in that fixture and sometimes there was none.

*Mary Comer,* for the defense:
She is 18 years old, a nurse's aide, and a friend of defendant. She lives at 1326 S. Rockwell with her brother and his family. On January 18,

1968, she called defendant about 6:30 p.m. and asked him to come to her house, which he did in about five minutes. He remained with her until about 7:00 or 7:30 p.m.

*Stella White*, for the defense:
She lived at 1332 Rockwell on January 16, 1968, and saw defendant between 6:00 and 7:00 that evening. He was on his way home from work. He said that he was going to clean up and return, but about five minutes after he left (about 7:00), she heard a shot. She went out on her back porch where she saw defendant being carried out on a stretcher.

*Carnell Brown*, in his own behalf:
He is from Louie, Mississippi where he lived until moving to Chicago in November of 1967. He first lived at 1332 S. Rockwell, but on the day he was shot (January 16, 1968) he was living with his aunt at 1320 S. Washtenaw. Prior to January 16, he had a job and had never been arrested or convicted of any crime. On that date he left work about 4:30 and went home. Everyone was home and he washed up but did not change his clothes, ate, and relaxed until 6:30 when he got a call from Mary Comer. He took some records to her house shortly after 6:30 and stayed there about an hour. When he left, he saw Otis Brown, talked with him and a girl named Alma for about 15 minutes, then went to 1332 S. Rockwell where he talked to Stella White between 7:00 and 8:00 for about 30 minutes. He then left for home, short-cutting through the alley. When he got to the end of the alley, a car pulled up and a man got out. The man had a gun drawn and said, "Come get in the car, Nigger." He turned around and ran back to 1332 S. Rockwell into the back of the basement, thinking someone would be there. None of the officers grabbed him before he got into the basement. The room was dark and he saw no light outside the room except for the light from a window. He saw no debris, bricks, sticks, or pipes. He hid in a corner and one of the men asked where he was. He went to move when he was shot by the man. He heard two shots. The man did not identify himself as a police officer or show a badge. He did not attack the man with a knife or a board. The men who chased him were not in uniform and their car did not look like a police car.

About five or ten minutes after he was shot, he was alone. Then the police came in and got him. He had crawled out of the room because he was hurt and wanted to be found. The police questioned him about a knife and gun and hi identity and residence. One uniformed officer grabbed his leg and kicked him.

He had never before seen the knife marked "People's Exhibit No. 1,"

nor had he ever owned a knife. He had no gun when he was arrested, but he had a wallet with no money which the police took.

*Dr. Milton Tinsley,* for the State in rebuttal:

He is a brain surgeon who examined Officer Chambers. He described Chambers' injuries as a laceration and crack in the skull. He had no opinion as to what may have caused these injuries.

*Officer Chambers,* recalled for the State in rebuttal:

Two men were brought to him at the hospital, Otis Brown and John Brown. He never identified John Brown as his attacker, or as being connected with the case.

*Officer Bork,* also recalled in rebuttal:

At the hospital, Chambers was shown two suspects but did not identify either one of them as his attacker. He did not know the name of the offender nor did he tell Officer Zepeda that John Brown was involved in this incident.

OPINION

Defendant's first contention, that he was not proven guilty beyond a reasonable doubt, rests on the argument that the State did not prove that he had knowledge that Officers Chambers and Bork were police officers.

The pertinent part of the statutory offense of aggravated battery is found in Ill. Rev. Stat. 1967, ch. 38, par. 12—4 (a) (6):

"(b) A person who, in committing a battery either:

"(6) Knows the individual harmed to be a peace officer, or a person summoned and directed by him, while such officer is engaged in the execution of any of his official duties including arrest or attempted arrest; *   *   *."

Armed violence, as charged in the two counts of this indictment, (Ill. Rev. Stat. 1967, ch. 38, par. 33A—2), is that defendant, while armed with a dangerous weapon, performed an act prohibited by section 12—4 (quoted above), or prohibited by section 31—1 (resisting or obstructing a peace officer).

■■ In our opinion, the testimony introduced by the State, particularly that of Officers Chambers and Bork, was sufficient, if believed, to establish defendant's guilt beyond a reasonable doubt. It is true that there was contradictory evidence on behalf of defendant, but it is the function of the trier of fact to determine matters of credibility. *People v. Novotny,* 41 Ill.2d 401, 411-412.

■■ Defendant's second contention is that the sentence of two to five years for armed violence exceeded the authorized penalty under Ill. Rev. Stat. 1967, ch. 38, par. 33A—3, in that the minimum of such sentence in this case could not be more than one year (the minimum for aggravated

battery). Since that section provides for a sentence of "not less than two years and not more than the maximum provided for the same act while unarmed," the point is misconceived. Defendant's citation of *People v. Hardaway*, 108 Ill.App.2d 325, 333, is also not well taken, as it involved aggravated assault, which at that time carried a maximum penalty of one year, rather than aggravated battery, which has a maximum penalty of five years.

Two counts of the indictment charged armed violence, but there was only one sentence, without designation as to a particular count. Since that sentence of two to five years exceeded the appropriate maximum in relation to the offense of resisting or obstructing a peace officer (section 31—1), we must assume that it applies to the charge relating to aggravated battery (section 12—4).

■■ Referring specifically to the language of this court, the charge of armed violence was that defendant, while armed with a dangerous weapon, "committed a battery on Scott Chambers, knowing him to be a peace officer engaged in the execution of his official duties." These quoted words are the language of Section 12—4(b)(6) and are identical to the indictment count which was the basis of defendant's conviction for aggravated battery. The only difference between the two counts, therefore, is that the battery charged in the second one added the words "while armed with a dangerous weapon." Since the proof supports the charge involving a deadly weapon, as the only battery proved was accomplished by means of a deadly weapon, and the acts, or series of acts in each instance were identical, the question arises as to whether there may be two sentences for the same conduct. The answer is that there may not be. (See *People v. Schlenger*, 13 Ill.2d 63, 66-68; also *People v. Baker*, 114 Ill.App.2d 450 and cases there cited.) We therefore affirm the sentence for armed violence (which we consider the more serious as it *necessarily* involves a dangerous weapon), and reverse the sentence for aggravated battery.

Affirmed in part and reversed in part.

DRUCKER and LORENZ, JJ., concur.